## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAURICE A. WILKINS,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:20-cv-02450** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **TOM WOLF, et al,** | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

Presently before the Court is Defendants' motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. No. 58.) Defendants' motion has been briefed by the parties and is ripe for the Court's disposition. For the reasons that are set forth below, the Court will grant in part and deny in part Defendants' motion.

## I.     BACKGROUND

On December 28, 2020, <u>pro se</u> Plaintiff Maurice A. Wilkins ("Plaintiff"), who is currently incarcerated within the Pennsylvania Department of Corrections ("DOC") at the State Correctional Institution in Huntingdon, Pennsylvania ("SCI Huntingdon"), commenced the above-captioned action by filing a complaint pursuant to 42 U.S.C. § 1983 against the following individuals: Governor of Pennsylvania, Tom Wolf ("Wolf"); DOC Secretary John Wetzel ("Wetzel"); DOC Dietician Anne Brown ("Brown"); DOC Chief of Food Service Craig Copper

("Copper"); SCI Huntingdon's Superintendent Kevin Kauffman ("Kauffman");

SCI Huntingdon's former Deputy Superintendent Scott Walters ("Walters"); and

SCI Huntingdon's former Food Service Manager Jaime Stuller ("Stuller"). (Doc.

No. 1.) Plaintiff subsequently filed an amended complaint, adding Defendants

Crystal Loy ("Loy") and Jill Spyker ("Spyker"). (Doc. No. 12.)

In the amended complaint, Plaintiff generally complained about the

measures the Pennsylvania Department of Corrections ("DOC") had taken in

response to the COVID-19 pandemic. (Id. at 3.) Plaintiff also complained about

how his sleep was being disrupted "almost every night" during the hours of 2:00

a.m. and 4:00 a.m. due to the "incessant noise" being made by a fog machine. (Id.

at 4.) Plaintiff further complained about how he was being deprived of adequate

nutrition and food that complied with his medical diet. (Id.) As a result of these

various allegations, Plaintiff asserted violations of his constitutional rights under

the First, Eighth, and Fourteenth Amendments, and he sought compensatory and

punitive damages, as well as declaratory and injunctive relief. (Id. at 5.)

On March 18, 2021, Defendants filed a motion to dismiss the amended

complaint, along with a brief in support thereof. (Doc. Nos. 23, 24.) By

Memorandum and Order dated April 22, 2021, the Court granted in part and

denied in part that motion to dismiss. (Doc. Nos. 32, 33.) Specifically, the Court

denied the motion as to Plaintiff's Eighth Amendment claims against Defendants

Copper, Brown, and Stuller regarding his medical diet, and as to Plaintiff's Eighth Amendment claim against Defendant Loy regarding the disruption of his sleep. (Id.)  The Court granted the motion, however, as to all other claims, and those claims were dismissed from the amended complaint without prejudice to Plaintiff filing a second amended complaint—except for Plaintiff's claims against Defendant Wolf; those claims were dismissed with prejudice.  (Id.)

On May 7, 2021, Plaintiff filed his second amended complaint, which is now the operative complaint in this matter.  (Doc. No. 36.)  He named Defendants Wetzel, Kauffman, Walters, Spyker, Copper, Brown, Stuller, and Loy, and he once again complained about the measures the DOC has taken in response to the COVID-19 pandemic, about how his sleep has been disrupted, and about how he has been denied adequate nutrition and food that complies with his medical diet. (Id.)  He asserts violations of his constitutional rights under the First and Eighth Amendments, and he seeks compensatory and punitive damages, as well as declaratory and injunctive relief.  (Id.)

On May 21, 2021, in response to the second amended complaint, Defendants filed a partial motion to dismiss, along with a brief in support.  (Doc. Nos. 37, 38.)  By Memorandum and Order dated June 10, 2021, the Court granted Defendants' motion and dismissed all of Plaintiff's claims except for his Eighth Amendment claims against Defendants Copper, Brown, Stuller, and Loy.  (Doc.

Nos. 40, 41.)  The Court then ordered these remaining Defendants to file an answer to Plaintiff's second amended complaint.  (Id.)  The Court also ordered the parties to complete discovery within six (6) months of the date on which Defendants filed their answer.  (Id.)

Defendants filed their answer on June 17, 2021 (Doc. No. 42), and the parties engaged in discovery.  On December 13, 2021, the Court issued an Order directing the parties to file any dispositive motions within sixty (60) days after the close of discovery.  (Doc. No. 54.)  In accordance with that Order, Defendants filed a motion for summary judgment on February 15, 2022, along with a brief in support, a statement of material facts, and various exhibits.  (Doc. Nos. 58-60.)  Following an extension of time, Plaintiff filed a brief in opposition, a responsive statement of material facts, and a statement listing what he believes to be the factual issues in this matter.  (Doc. Nos. 63-65.)

Thus, Defendants' motion for summary judgment, which has been briefed by the parties, is now ripe for the Court's disposition.  In accordance with the legal standard governing such motions for summary judgment, the Court will grant in part and deny in part Defendants' motion.

## II.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law."  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  And, a disputed material fact is "genuine . . . [i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]"  See Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991) (citing Anderson, 477 U.S. at 248).

A party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  See id. at 325.

5

Once the moving party has met its initial burden, the burden shifts to the nonmoving party, who may not rest upon the unsubstantiated allegations or denials of its pleadings and, instead, must go beyond its pleadings, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to show a genuine dispute of material fact.  See Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324.  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is proper. See id. at 322.  Summary judgment is also proper if the nonmoving party provides evidence that is "merely colorable" or that "is not significantly probative[.]"  See Gray, 957 F.2d at 1078.

In addition, when deciding a motion for summary judgment, "the court must view all evidence and draw all inferences in the light most favorable to the non-moving party[.]"  See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008) (citing Davis v. Mountaire Farms, Inc., 453 F.3d 554, 556 (3d Cir. 2006)); M.S. by & through Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 125 (3d Cir. 2020) (stating that, when reviewing a motion for summary judgment, courts are to "view the evidence in the light most favorable to the non-moving party").

## III.   DISCUSSION

### A.   Statement of Material Facts

Under the Court's Local Rules, a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." See M.D. Pa. L.R. 56.1.  In addition, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in [the moving party's statement], as to which [the non-moving party] contend[s] that there exists a genuine issue to be tried." See id.

In accordance with the Court's Local Rules, the parties have filed their respective statements of material facts.  (Doc. Nos. 60, 63.)  From those statements, the Court has culled the undisputed facts in this matter and has set forth those facts below.  To the extent that there are any disputes arising from the parties' statements, the Court will expressly note such disputes herein.

### 1.   Defendant Loy

Plaintiff asserts an Eighth Amendment claim against Defendant Loy regarding the disruption to his sleep.  More specifically, Plaintiff asserts that Defendant Loy is responsible for the excessive noise produced by a fog machine that had been utilized at SCI Huntingdon during the hours of 2:00 a.m. and 4:00

a.m. "almost every night" causing Plaintiff sleep deprivation.  (Doc. Nos. 60 ¶ 11, 63 ¶ 11.)[1]  As the Major of Unit Management at SCI Huntingdon, Defendant Loy is responsible for ensuring that all aspects of unit management conform to established department policies.  (Doc. Nos. 60 ¶ 12, 63 ¶ 12.)

The fog machine, to which Plaintiff refers, is utilized at SCI Huntingdon pursuant to Centers for Disease Control and Prevention ("CDC") guidance, as a mitigation measure to combat the spread of COVID-19.  (Doc. Nos. 60 ¶ 13, 63 ¶ 13.)  The fog machine is operated for its intended purposes and in accordance with the directions contained within the operator's manual.  (Doc. Nos. 60 ¶ 14, 63 ¶ 14.)   The fog machine is used on every block within the institution, but the time of day or night that it is used on a particular unit will vary.  (Doc. Nos. 60 ¶ 15, 63 ¶ 15.)  The fog machine runs for a maximum of fifteen (15) to twenty (20) minutes in each area.  (Doc. Nos. 60 ¶ 22, 63 ¶ 22.)

Staff at SCI Huntingdon have employed efforts to operate the fog machine in the least disruptive manner possible.  (Doc. Nos. 60 ¶ 16, 63 ¶ 16.)  The fog machine must be used at times when there is no movement by staff or inmates and, as a result, it is generally used when the inmates are secured in their cells for the night.  (Doc. Nos. 60 ¶ 17, 63 ¶ 17.)  Since the time during which the machine is

---

[1] Although not expressly set forth in the parties' statements of material facts, it appears that the alleged sleep deprivation began in June of 2020 and continued until at least January of 2021.  (Doc. No. 65-1 at 5.)

used on a given unit will vary, Defendants acknowledge that the machine may have been used, at times, on Plaintiff's block between the hours of 2:00 a.m. and 4:00 a.m.  (Doc. Nos. 60 ¶ 18, 63 ¶ 18.)

Plaintiff submitted two (2) inmate request forms regarding the use of the fog machine.  (Doc. Nos. 60 ¶ 19, 63 ¶ 19.)  In those requests, Plaintiff complained that the noise caused by the fog machine was disruptive to his sleep and, thus, he suggested that the fog machine be used from 9:00 a.m. until 11:30 p.m.  (Doc. Nos. 60 ¶ 20, 63 ¶ 20.)  Defendant Loy responded to Plaintiff's requests, explaining that the fog machine had to be used on every block at SCI Huntingdon, the timing of which would vary, and that the machine also had to be used at times when there was no movement.  (Doc. Nos. 60 ¶ 21, 63 ¶ 21.)  Thus, Defendant Loy indicated that the machine would continue to be used throughout the night.  (Id.)

On December 17, 2020, Plaintiff filed Grievance Number 904894 concerning the "unnecessary noise" being produced by the fog machine, which he claimed was disrupting his sleep.  (Doc. Nos. 60 ¶ 24, 63 ¶ 24.)  SCI Huntingdon's Safety Manager, A. Scalia ("Scalia"), issued the initial response, denying Plaintiff's grievance.  (Doc. Nos. 60 ¶ 25, 63 ¶ 25.)  Scalia explained that the fog machine was being used in response to the COVID-19 pandemic and in accordance with CDC guidelines to sanitize the high touch areas of the housing units.  (Id.)

Scalia's initial response was upheld on appeal by Defendant Kauffman,[2] who had noted that, pursuant to CDC guidelines, the DOC was "tasked with fogging the entire institution daily[,]" that it "[was] very time consuming[,]" and that, therefore, "there [was] no way to accommodate everyone's sleep schedule[.]" (Doc. No. 59-1 at 52; Doc. Nos. 60 ¶ 26, 63 ¶ 26.)  Defendant Kauffman also noted that staff members were "trying to quickly and safely disinfect all common areas on every unit daily in an effort to mitigate the spread of the virus for [Plaintiff's] health and safety." (Doc. Nos. 60 ¶ 26, 63 ¶ 26.)   The denial was upheld on final review.  (Id.)

Since March 1, 2020, Plaintiff has had forty-two (42) contacts with medical staff—including doctors, nurses, and mental health staff—to address various medical concerns.  (Doc. Nos. 60 ¶ 27, 63 ¶ 27.)  During these contacts with medical staff, Plaintiff never once raised any concerns regarding his sleep deprivation or having difficulty sleeping.  (Doc. Nos. 60 ¶ 28, 63 ¶ 28.) Additionally, Defendant Loy never received complaints from any other inmates concerning the noise from the fog machine or that the noise from the fog machine disrupted their sleep.  (Doc. Nos. 60 ¶ 23, 63 ¶ 23.)

---

[2]  Defendant Kauffman was terminated from this action on June 10, 2021.  (Doc. Nos. 40, 41.)

### 2.     Defendants Copper, Brown, and Stuller

Plaintiff asserts an Eighth Amendment claim against Defendants Copper, Brown, and Stuller for their deliberate indifference to his medical dietary needs.[3] (Doc. Nos. 60 ¶ 29, 63 ¶ 29.)  With respect to Defendant Copper, Plaintiff avers that, as DOC Chief of Food Service, he oversees Defendants Brown and Stuller and is responsible for ensuring the nutritional adequacy of all food provided to inmates within the DOC.  (Doc. Nos. 60 ¶ 30, 63 ¶ 30.)   With respect to Defendant Brown, Plaintiff avers that, as the DOC's Dietician, she is responsible for ensuring nutritional adequacy of all food provided to inmates within the DOC.  (Doc. Nos. 60 ¶ 31, 63 ¶ 31.)  And, with respect to Defendant Stuller, Plaintiff avers that, as the former Food Service Manager at SCI Huntingdon, he was responsible for ensuring that the inmates at the institution received nutritionally adequate diets. (Doc. Nos. 60 ¶ 32, 63 ¶ 32.)

Plaintiff claims that he must receive a special diet because of (1) his corn allergy and (2) his diagnosis of Celiac disease.[4]  (Doc. Nos. 60 ¶ 33, 63 ¶ 33.) Defendants contend that, although a gluten allergy is noted, Plaintiff's medical records do not contain a formal diagnosis of Celiac disease.  (Doc. No. 60 ¶ 34.)  In

---

[3]  The Court will simply refer to "medical dietary needs" as "dietary needs."

[4]  Neither party has explained the specific contours of either Plaintiff's corn allergy or his diagnosis of Celiac disease.

support, Defendants have pointed to the Declaration of Paula Price ("Price"), the Corrections Healthcare Administrator at SCI Huntingdon.  (Doc. No. 59-1 at 118-20.)  She declares as follows: "A Celiac panel was conducted for [Plaintiff] on August 5, 2021.  Although the results indicated a moderate to strong positive result, an official diagnosis is not reflected in his medical records."  (Id. at 119.)

Plaintiff contends, however, that he received a letter, dated May 14, 2020, from Defendant Copper, acknowledging that Plaintiff has a diagnosis for Celiac disease.  (Doc. No. 63 ¶ 34.)  In support, Plaintiff points to Defendant Copper's letter, which states as follows: "[Plaintiff's] medical team completed testing which confirmed a diagnosis of Celiac disease."  (Doc. No. 65-1 at 167; Doc. No. 63 ¶ 36.)  In addition, Plaintiff has also pointed to Defendants' responses to his third set of requests for admissions, wherein Defendants assert that "[a] Celiac Panel was completed February 5, 2020."  (Doc. No. 65-1 at 201.)  Thus, there is not only a genuine dispute as to whether Plaintiff was formally diagnosed with Celiac disease, but also when, exactly, Plaintiff's Celiac panels were completed.

Plaintiff asserts that he has been provided with meals that are nutritionally inadequate and that conflict with his dietary needs.  (Doc. Nos. 60 ¶ 35, 63 ¶ 35.) Defendants contend that Defendant Brown's predecessor had written Plaintiff's "no wheat/no corn" menu dated March 5, 2020.  (Doc. No. 60 ¶ 36 (explaining that this predecessor determined that the March 5, 2020 menu properly conformed to

Plaintiff's communicated needs).)  Defendants contend that, when Defendant Brown commenced her role as the DOC's Dietician on January 6, 2020, she "approved the diet request" and forwarded the March 5, 2020 menu to the appropriate staff at SCI Huntingdon, where Plaintiff was incarcerated.  (Id.; Doc. 59-1 at 121.)  In support, Defendants point to Defendant Brown's declaration, which confirms the same.  (Doc. No. 59-1 at 122.)

Plaintiff contends, however, that in Defendants' responses to Plaintiff's second set of requests for admissions, Defendants have offered conflicting information as to the March 5, 2020 menu.  (Doc. No. 63 ¶ 36.)  More specifically, he points to Defendants' responses under questions six (6) and eight (8).  (Id.)  In response six (6), Defendants refer to the March 5, 2020 menu as a "gluten-free menu[,]" but in response eight (8), Defendants refer to the March 5, 2020 menu as the "no wheat/no corn menu[.]"[5]  (Id.; Doc. No. 65-1 at 216.)

Additionally, Defendants contend that Plaintiff's menus have been consistent with his dietary needs since March of 2020 and that they have been structured to provide adequate nutrition and caloric intake.  (Doc. No. 60 ¶ 37.)  In support of their contention, Defendants point to Defendant Brown's declaration, who declares the same.  (Doc. No. 59-1 at 122.)  Plaintiff contends, however, that

---

[5]  As stated above, Plaintiff claims that he has both a corn allergy and Celiac disease.

based upon Defendants responses to his second set of requests for admissions—
wherein Defendants offered conflicting information about the March 5, 2020 menu
in response to questions six (6) and eight (8)— Defendants have provided him with
"inadequate nutrition" because "the diet was incorrect" and thus presented "a
health risk to [him]."  (Doc. No. 63 ¶ 37.)  Consequently, there is a genuine dispute
as to whether Plaintiff's dietary needs have been met since March of 2020.

Although there is currently no established recommendation for the daily
intake of calories, the standard used to evaluate the Master Menu at the DOC
establishes a value of 2000 calories per day.  (Doc. Nos. 60 ¶ 38, 63 ¶ 38.)   At all
times relevant to the litigation, Defendants contend that Plaintiff's daily caloric
intake exceeded that standard (i.e., 2000 calories per day) and has remained within
an acceptable range.  (Doc. No. 60 ¶ 39.)  Plaintiff contends, however, that
"calories" have to be deducted from this total amount because the "menu" (and the
Court presumes he is referring to March 5, 2020 menu) was incorrect, and he could
not eat the "conflictive food" that the kitchen sent.  (Doc. No. 63 ¶¶ 38, 39.)

Plaintiff takes issue with the provision of cold rice for breakfast, claiming it
lacks any nutritional value and that it fails to provide him with the proper caloric
intake.  (Doc. Nos. 60 ¶ 40, 63 ¶ 40.)  Rice may be properly served either hot or
cold, in conformity with the applicable food code standards.  (Doc. Nos. 60 ¶ 41,

63 ¶ 41.)  In addition, Rice provides calories, B vitamins, zinc, magnesium, and iron.  (Doc. Nos. 60 ¶ 42, 63 ¶ 42.)

In addition to rice, Plaintiff also received juice, milk, coffee, sugar, margarine, hard cooked eggs,[6] and rice cakes at breakfast, which is consistent with what is provided with the "mainline breakfast" that is served to the general inmate population.  (Id.; Doc. No. 59-1 at 123.)  Thus, Plaintiff's breakfast menu provided a nutritionally adequate and balanced daily breakfast.  (Id.)

Presently, Plaintiff's menu does not include rice for breakfast.  (Doc. Nos. 60 ¶ 43, 63 ¶ 43.)  Defendant Brown instituted this change to Plaintiff's menu in an effort to provide more acceptable alternatives for Plaintiff.  (Id.)  This decision was not prompted by any nutritional concerns associated with rice.  (Id.)

When Defendant Brown began rewriting Plaintiff's menu in May of 2020, she had not been advised of a formal diagnosis of Celiac disease.  (Doc. Nos. 60 ¶ 44, 63 ¶ 44.)  However, based upon the results of Plaintiff's Celiac panels that she received, she determined that a gluten-free diet was appropriate for Plaintiff and, thus, she removed oatmeal from his menu.  (Id.)  Accordingly, Plaintiff's rewritten menu accommodated "the newly communicated[,]" but "not yet medically documented[,]" Celiac disease.  (Doc. Nos. 60 ¶ 45, 63 ¶ 45.)   In addition,

---

[6]  Plaintiff, without pointing to any evidence in the summary judgment record, claims that eggs were not included every day, only on Wednesdays and Sundays. (Doc. No. 63 ¶ 42.)

Plaintiff's diet was also tailored to accommodate his corn allergy.  (Doc. Nos. 60 ¶ 44, 63 ¶ 44.)   Although Plaintiff does not dispute most of these facts, he contends that the Celiac panels were completed on February 5, 2020, but that Defendant Brown did not rewrite his menu until months later in May of 2020, subjecting Plaintiff to "a health risk."  (Doc. No. 63 ¶¶ 44, 45.)

Defendants contend that Defendant Brown neither advised staff to serve Plaintiff food that conflicted with his dietary needs, nor possessed personal knowledge of any incidents when food that conflicted with Plaintiff's approved diet was served to him.  (Doc. No. 60 ¶ 46.)  In support of their contention, Defendants point to Defendant Brown's declaration, which confirms the same. (Doc. No. 59-1 at 124.) Plaintiff contends, however, that Defendant Brown had knowledge of conflicting food items, yet she failed to correct the menu for months. (Doc. No. 63 ¶ 46.)  And, in support of his contention, Plaintiff points to the response he initially received concerning Grievance Number 867312.  (Doc. No. 65-1 at 163.)  That response states that, on May 13, 2020, CFSM1 R. Barnes ("Barnes") became aware that Plaintiff was on a "Gluten Free/No Corn Diet" and that, on May 5, 2020 (the date in question in the grievance), "the diet menus put out by Central Office [had] included rice crispies and oatmeal."  (Id.)  That initial response further states that, once Barnes became aware of this, he "immediately contacted the Central Office Dietician, [Defendant] Brown."  (Id.)  Ultimately,

"[t]he [d]ietary staff at SCI Huntingdon was directed to follow the diet menus they had in place[,]," explaining that "[t]he Dietician [was] working on re-writing the diets to coincide with what is available through the contract."  (Id.)  Thus, while the initial response also states that oatmeal and rice crispies were eliminated from Plaintiff's meal tray, there is still a dispute concerning whether Defendant Brown advised staff to serve Plaintiff food that conflicted with his dietary needs and/or whether she possessed personal knowledge of any incidents of when food that conflicted with his dietary needs was served to him.

Plaintiff submitted various complaints to prison staff, regarding food that was served to him and that allegedly conflicted with his dietary needs.  (Doc. Nos. 60 ¶ 47, 63 ¶ 47.)  More specifically, those complaints are referenced in Grievance Numbers 865386, 867265, 867312, 867430, 875450, 874068, 894703, and 935522. (Id.)  The parties' address each of those grievances in turn, and the Court will do the same.

Plaintiff filed Grievance Number 865386 on April 26, 2020, alleging that he was not provided with a diet tray during the lockdowns that began on April 26, 2020, and ended on April 29, 2020.  (Doc. Nos. 60 ¶ 57, 63 ¶ 57.)  Defendant Spyker[7] responded to the grievance, indicating that Defendant Stuller had verified

---

[7] Defendant Spyker was terminated from this action on June 10, 2021.  (Doc. Nos. 40, 41.)

17

that special diet trays were made during the lockdown.  (Id.)  Defendant Spyker

also noted that Plaintiff had indicated in his own grievance that he had observed

kosher bags being distributed during the lockdown.  (Id.)  Defendant Spyker thus

stated that, if Plaintiff had not received his special diet trays, then "[i]t was an

oversite [sic] and not intentional[.]"  (Id.)

Plaintiff filed Grievance Number 867265 on May 2, 2020, complaining

about an incorrect item on Plaintiff's meal tray (i.e., oatmeal).  (Doc. Nos. 60 ¶ 48,

63 ¶ 48.)  Defendant Stuller responded to the grievance, explaining that kitchen

staff had utilized the incorrect menu to prepare Plaintiff's meal tray that day, but

that the issue had been corrected.  (Id.; Doc. No. 59-1 at 72 (acknowledging that

Plaintiff should "be getting gluten free cereal" and not oatmeal).)  Defendant

Stuller also explained that the "state dietician" had been contacted and that "she

[was] rewriting [Plaintiff's] menu to reflect all necessary changes."  (Doc. No. 59-

1 at 72.)  Plaintiff does not dispute these facts, but contends that the grievances he

subsequently filed reveal that the issue had not, in fact, been corrected.  (Doc. No.

63 ¶ 48.)

Plaintiff filed Grievance Number 867312 on May 5, 2020, complaining

about incorrect items on his meal tray (i.e., rice crispies and oatmeal).  (Doc. Nos.

60 ¶ 49, 63 ¶ 49.)  Plaintiff stated that the staff member who was filling in for

Defendant Stuller at the time (i.e., Barnes) was taking seemingly "malicious and

sadistic actions" by not following Plaintiff's menu.  (Id.)  Defendant Spyker

responded to the grievance, explaining that, when Barnes became aware of

Plaintiff's concerns on May 13, 2020, he "stepped up and reached out as soon as he

was aware there was a concern and that shows an act of caring without malicious

intent."  (Id.)  More specifically, Barnes "immediately contacted the Central Office

Dietician [Defendant] Brown[.]"  (Doc. No. 59-1 at 78.)   In addition, Defendant

Spyker explained that, on that same date, the incorrect items were removed from

Plaintiff's meal tray.  (Id.)

According to Defendant Brown, when Barnes contacted her on May 13,

2020, concerning the incorrect items on Plaintiff's menu, she advised Barnes "that

the March 5, 2020 menu included oatmeal as the primary cereal because the diet

was written as an allergy to wheat and corn, not Celiac disease."  (Id. at 124.)

Defendant Brown also informed Barnes that she "was in the process of re-writing

the menu to coincide with the food options available through the corresponding

food contract" and that "these revisions would eliminate oatmeal from the menu

and accommodate the newly communicated potential Celiac diagnosis."  (Id.)  She

further informed Barnes that "gluten free Rice Chex or additional rice cakes could

be provided in place of oatmeal, while the new menu was pending."  (Id.)  She

asserts that she never knowingly advised staff to serve Plaintiff food that conflicted

with his dietary needs.  (Id.)  She also asserts that she does not have personal

knowledge of "any incidents in which food that conflicted with the approved diet was served." (Id.)

Plaintiff points, however, to Defendant Spyker's initial response to Grievance Number 867312, wherein Defendant Spyker specifically states that, once Barnes became aware of the incorrect items on Plaintiff's meal tray and contacted Defendant Brown, the dietary staff at SCI Huntingdon "was directed to follow the diet menus they had in place." (Id. at 78.) Thus, as stated above, there is a dispute concerning whether Defendant Brown advised staff to serve Plaintiff food that conflicted with his dietary needs.

Plaintiff filed Grievance Number 867430 on May 10, 2020, complaining about incorrect items of food on Plaintiff's meal trays (i.e., oatmeal and cream of wheat). (Doc. Nos. 60 ¶ 51, 63 ¶ 51.) Defendant Stuller responded to the grievance, indicating that the kitchen staff had utilized the incorrect menu to prepare Plaintiff's meal tray, but that the issue had since been corrected. (Id.) Defendant Stuller further indicated that the state dietician was contacted and "she [was] rewriting [Plaintiff's] menu to reflect all necessary changes." (Doc. No. 59-1 at 84.) Plaintiff does not dispute these facts, but he does point out that, in Grievance Number 867265, he complained about receiving oatmeal, as it does not comply with his gluten-free diet, and that eight (8) days later, in Grievance 867430, he again complained about receiving oatmeal. (Id. at 74, 86.)

Plaintiff filed Grievance Number 875450 on June 28, 2020, again complaining about an incorrect food item on his meal tray (i.e., rice crispies). (Doc. Nos. 60 ¶ 52, 63 ¶ 52.)  Defendant Stuller investigated and responded that the inmate cook had incorrectly placed the rice crispies on Plaintiff's meal tray while preparing Plaintiff's tray.  (Id.)  Defendant Stuller acknowledged that Plaintiff should not have received this item due to his corn allergy.  (Id.)

Plaintiff filed Grievance Number 874068 on June 21, 2020, again complaining about an incorrect food item on his meal tray (i.e., peanut butter and jelly).  (Doc. Nos. 60 ¶ 53, 63 ¶ 53.)  Plaintiff stated that this demonstrated a "clear lack of leadership . . . and a lack of care if [he] eat[s] or not."  (Id.)  Defendant Stuller responded that an inmate cook indicated that he had added the incorrect item to Plaintiff's tray "as a kind gesture[,]" and that the remaining items on the tray were correct.  (Id.)  The inmate cook was reminded to follow the menus "to the tee, as food service does care about whether [Plaintiff] eat[s] or not."  (Id.)

Plaintiff filed Grievance Number 894703 on October 18, 2020, complaining that he had received a "mainline" meal tray, which is served to the general inmate population.  (Doc. Nos. 60 ¶ 54, 63 ¶ 54.)  Defendant Spyker responded to the grievance and explained that when staff was notified of the issue with Plaintiff's meal tray, they took steps to rectify the situation.  (Id.)  Defendant Spyker also

explained that, although kitchen staff members do monitor and check trays prior to delivery, they were again reminded to do so.  (Id.)

Plaintiff filed Grievance Number 935522 on July 8, 2021, complaining generally about incorrect items on his meal trays.  (Doc. Nos. 60 ¶ 55, 63 ¶ 55.) Following an investigation into Plaintiff's concerns, Defendant Spyker determined that Plaintiff's meals were inspected prior to delivery and that the approved menu was followed.  (Id.)  Defendant Spyker also stated that Plaintiff's "health is important[,] and the kitchen staff will continue to follow the approved menu and inspect that [Plaintiff's] trays are correct prior to being delivered."  (Id.)

### B.    Plaintiff's Eighth Amendment Claims Against Defendants

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" Glossip v. Gross, 576 U.S. 863, 876 (2015).  In order "[t]o determine whether prison officials have violated the Eighth Amendment, [courts] apply a two-prong test: (1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" See Porter v. Pennsylvania Dep't of Corr., 974 F.3d 431, 441 (3d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

22

Regarding the first prong, life's necessities include food, clothing, shelter, medical care, and reasonable safety.  See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000) (stating that "when the government takes a person into custody against his or her will, it assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety" (citation omitted)).  Regarding the second prong, a prison official does not act with deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety"—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  See Farmer, 511 U.S. at 837.

Whether conditions of confinement "constitute 'cruel and unusual punishment' is measured against 'the evolving standards of decency that mark the progress of a maturing society.'"  See Porter, 974 F.3d at 441 (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)); Helling v. McKinney, 509 U.S. 25, 36 (1993) (explaining that courts are "to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk" and that, "[i]n other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate" (emphasis in original)).  "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not

unconstitutional." See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Thus, "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  See id.

### 1.    Plaintiff's Eighth Amendment Claim Against Defendant Loy

Plaintiff asserts an Eighth Amendment claim against Defendant Loy, claiming that she was responsible for the "excessive noise" produced by the fog machine that was utilized at SCI Huntingdon, "almost every night," during the hours of 2:00 a.m. and 4:00 a.m., causing Plaintiff sleep deprivation.  (Doc. Nos. 60 ¶ 11, 63 ¶ 11.)  As noted above, although neither party has identified the specific timeframe in which Plaintiff alleges he was deprived of sleep, it appears that the alleged deprivation began in June of 2020 and continued until at least January of 2021.  (Doc. No. 65-1 at 5.)

In moving for summary judgment, Defendants acknowledge that "[s]leep is a basic human need" and that, "under certain circumstances, conditions causing sleep deprivation may violate the Eighth Amendment."  (Doc. No. 59 at 4 (citations omitted).)  Defendants argue, however, that under the circumstances of this case, it cannot be said that Defendant Loy violated the Eighth Amendment. (Id. at 5-8.)  The Court agrees.

Although sleep constitutes a basic life necessity, see Mammana v. Fed. Bureau of Prisons, 934 F.3d 368, 374 (3d Cir. 2019), the Court finds that Plaintiff

has not shown or otherwise raised any genuine issue of material fact that there was an "'objectively, sufficiently serious'" deprivation of this basic life necessity such that it implicates the Eighth Amendment.  See Porter, 974 F.3d at 441 (quoting Farmer, 511 U.S. at 834).  The Court's finding is supported by the summary judgment record, which reveals that there was a legitimate penological justification for SCI Huntingdon using the fog machine, that Plaintiff's exposure to the noise from the fog machine was limited in duration, and that there was a lack of harm or injury that Plaintiff suffered from as a result of that noise.

More specifically, the record reflects as follows: that the fog machine was used, pursuant to CDC guidance, as a mitigation measure to combat the spread of COVID-19 (Doc. Nos. 60 ¶ 13, 63 ¶ 13); that the fog machine was operated for its intended purposes and in accordance with the directions contained within the operator's manual (Doc. Nos. 60 ¶ 14, 63 ¶ 14); that it would only run for a maximum of fifteen (15) to twenty (20) minutes in each area (Doc. Nos. 60 ¶ 22, 63 ¶ 22);[8] and that, even though Plaintiff had forty-two (42) contacts with medical staff since March 1, 2020, to address his various medical concerns (Doc. Nos. 60 ¶ 27, 63 ¶ 27), he never once raised any concerns regarding his asserted sleep

---

[8] Although Plaintiff contends that the machine ran for twenty-five (25) to thirty (30) minutes at a time, he has not pointed to any evidence in support of this assertion.  (Doc. No. 63 ¶ 22.)  In any event, the difference between the parties' asserted durations of time is a matter of minutes and, thus, inconsequential.

deprivation or having difficulty sleeping (Doc. Nos. 60 ¶ 28, 63 ¶ 28).  Thus, in light of this record, the Court finds that Plaintiff has not shown, or otherwise raised a genuine dispute of material fact, that the alleged risk of constitutional harm (i.e., sleep deprivation) was "so grave that it violate[d] contemporary standards of decency to expose" him to such a risk of harm.  See Helling, 509 U.S. at 36.

    In fact, Plaintiff himself recognizes the importance of the fog machine, but nevertheless argues that it should have been used at other times during the day. (Doc. 59-1 at 51; Doc. 63 ¶¶ 13-18.)  The underlying record reveals, however, that the fog machine had to be used at times when there was no movement by staff or inmates and that, consequently, it was generally used when the inmates were secured in their cells for the night.  (Doc. Nos. 60 ¶ 17, 63 ¶ 17.)  Additionally, and as explained to Plaintiff during his utilization of the prison's grievance process, the DOC was tasked, per CDC guidance, "with fogging the entire institution daily[,]" that it "[was] very time consuming[,]" and that, there was, therefore, "no way to accommodate everyone's sleep schedule[.]"  (Doc. No. 59-1 at 52; Doc. Nos. 60 ¶ 26, 63 ¶ 26.)

    Thus, while the Court is not unsympathetic to the fact that the sound of the fog machine may have been unpleasant for Plaintiff, the Court finds that Plaintiff's asserted risk of constitutional harm (i.e., sleep deprivation) was not "objectively harmful enough, or sufficiently serious[,]" to implicate the Eighth Amendment.

See Ricks v. Shover, 891 F.3d 468, 473 (3d Cir. 2018) (citation and internal quotation marks omitted); Whitney v. Wetzel, 649 F. App'x 123, 127 (3d Cir. 2016) (finding that the district court correctly granted summary judgment to defendants on a prisoner-plaintiff's Eighth Amendment claim, which concerned noise levels in a particular housing unit within the prison, because the plaintiff had failed to show that the noise was "so excessive and pervasive that it posed a serious risk of injury to him").

In addition to considering the underlying record in this matter, the Court is also heeding the long-standing principle that prison officials must be afforded deference in their ability to take appropriate action in order to ensure the health and safety of inmates and corrections personnel alike.  See generally Bell v. Wolfish, 441 U.S. 520, 546-47 (1979).  The application of that principle is particularly relevant here, where it is undisputed that the fog machine was being used in accordance with CDC guidelines to respond to the COVID-19 pandemic.  See generally Hope v. Warden York Cnty. Prison, 972 F.3d 310, 330 (3d Cir. 2020) (stating that COVID-19 presents "highly unusual and unique circumstances," which have "radically transformed our everyday lives in ways previously inconceivable," and which have "altered [our world] with lightning speed . . . and unprecedented [results]" (citation, and internal citations and quotation marks omitted) (alternations in original).

Accordingly, for all of these reasons, the Court finds that Defendant Loy is entitled to summary judgment.  Thus, the Court will grant Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claim against Defendant Loy regarding his alleged sleep deprivation.

### 2.    Plaintiff's Eighth Amendment Claims Against Defendants Copper, Brown, and Stuller

Plaintiff also asserts an Eighth Amendment claim against Defendants Copper, Brown, and Stuller for deliberate indifference to his dietary needs.  (Doc. Nos. 60 ¶ 29, 63 ¶ 29.)  More specifically, Plaintiff asserts that they violated the Eighth Amendment when they failed to provide him with a nutritionally adequate diet, when they served him food that conflicted with his medical diet, and when they did not provide him with his special diet meals for three days during an institutional lockdown.  (Doc. No. 60 ¶¶ 29, 35, 56; Doc. No. 63 ¶¶ 29, 35, 56.)

It has been established that food constitutes a basic life necessity, see, e.g., Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000), and Defendants do not dispute that adequate nutrition and sufficient caloric intake are contemplated by this necessity.  Instead, Defendants argue that there was no sufficiently serious deprivation of this basic life necessity such that it violated the Eighth Amendment.  (Doc. No. 59 at 11-13.)  Defendants further argue that there is no evidence to suggest that they acted with deliberate indifference to Plaintiff's dietary needs.  (Id.)  The Court addresses these arguments more fully below.

a.      **Nutritional Adequacy of Meals, Sufficient Caloric Intake, and Conflicting Food**

In moving for summary judgment, Defendants Copper, Brown, and Stuller argue that Plaintiff's menu has been consistent with his dietary needs since March of 2020, that his menu has been structured to provide sufficient nutrition and caloric intake, and that his menu does not contain items that conflict with his dietary needs.  (Id. at 9-11.)  Thus, Defendants contend that Plaintiff has failed to demonstrate an objectively serious deprivation of his dietary needs.  (Id.)  They further contend that Plaintiff has likewise failed to demonstrate that they acted with deliberate indifference to such dietary needs.  (Id. at 11-13.)

The Court, however, is unpersuaded.  Plaintiff has raised a genuine dispute as to whether the March 5, 2020 menu, that Defendant Brown's predecessor had written and that Defendant Brown had approved was consistent with Plaintiff's dietary needs.  As discussed above, Plaintiff has pointed to Defendants' discovery responses, which offer contradictory information as to the March 5, 2020 menu. (Doc. No. 63 ¶ 36.)  In those responses, Defendants refer to the March 5, 2020 menu as a "gluten-free menu" in one response, but as a "no wheat/no corn menu" in another response.  (Id.; Doc. No. 65-1 at 216.)  Plaintiff has asserted that this contradiction demonstrates that Defendants did not provide him with adequate nutrition because "the diet was incorrect" and thus presented "a health risk to

29

[him]." (Doc. No. 63 ¶ 37.)  Accordingly, there is a genuine dispute as to whether Plaintiff's March 5, 2020 menu was consistent with his dietary needs.

In addition, Plaintiff has also raised a genuine dispute of material fact regarding his asserted Celiac disease.  Although Defendants take the position that Plaintiff's medical records do not contain a formal or official diagnosis of Celiac disease (Doc. No. 60 ¶ 34; Doc. No. 59-1 at 119), Plaintiff has pointed to the May 14, 2020 letter that he received from Defendant Copper, wherein Defendant Copper expressly recognizes that Plaintiff has a diagnosis for Celiac disease (Doc. No. 65-1 at 167.; Doc. No. 63 ¶ 36).  Plaintiff asserts that Defendants' failure to properly recognize this disease resulted in him receiving foods that conflicted with his dietary needs see, e.g., (Doc. No. 65 at 7) and, in support, Plaintiff has pointed to the various grievances he filed at SCI Huntingdon, concerning the incorrect food items on his meal trays (Doc. No. 59-1 at 48-117 (containing Plaintiff's grievances).)  Thus, the Court finds that Plaintiff has raised a genuine dispute of material fact regarding his asserted Celiac disease.

Furthermore, Plaintiff has raised a genuine dispute of material fact concerning whether he was provided with sufficient caloric intake.  Although it is undisputed that there is currently no established recommendation for the daily intake of calories, the standard used to evaluate the Master Menu at the DOC establishes a value of 2000 calories per day.  (Doc. Nos. 60 ¶ 38, 63 ¶ 38.)   And,

while Defendants contend that Plaintiff's daily caloric intake exceeded this standard (i.e., 2000 calories per day) (Doc. No. 60 ¶ 39), Plaintiff has argued that "calories" have to be deducted from this total amount because the March 5, 2020 menu was incorrect and, thus, he could not eat the "conflictive food" that the kitchen sent him (Doc. No. 63 ¶¶ 38, 39).  In support, Plaintiff has once again pointed to the various grievances he filed at SCI Huntingdon to demonstrate that he could not eat food that conflicted with his medical diet and that, as a result, his caloric intake was insufficient.  (Id.)

Thus, to the extent that Defendants Copper, Brown, and Stuller move for summary judgment on the basis that Plaintiff has failed to show an objectively serious deprivation of his dietary needs, the Court will deny their motion. As discussed above, the Court finds that there are genuine disputes of material fact that preclude granting summary judgment on this basis.

However, the Court's analysis does not end there.[9]  Defendants have also argued that there is no evidence in the summary judgment record to establish that Defendants Copper, Brown, and Stuller acted with deliberate indifference to

---

[9]  In order for Plaintiff to prevail on a claim that the conditions of his confinement violated the Eighth Amendment, Plaintiff must establish both prongs of the two-prong test discussed above—i.e., that (1) the deprivation was "'objectively, sufficiently serious'" **and** that (2) the prison official was "'deliberate[ly] indifferen[t] to [his] health or safety.'"  See Porter, 974 F.3d at 441 (quoting Farmer, 511 U.S. at 834) (alterations in original).

Plaintiff's dietary needs.  More specifically, Defendants contend that: with respect to Defendants Brown and Copper, there is no evidence to suggest that they advised SCI Huntingdon staff to serve Plaintiff food that conflicted with his dietary needs or that they were aware of, or otherwise involved in, any incidents in which Plaintiff was served food that conflicted with his diet (Doc. 59 at 11-12); and with respect to Defendant Stuller, there is no evidence to suggest that he disregarded a risk to Plaintiff's health or otherwise failed to take steps to abate such a risk to Plaintiff's health (id. at 12-13).  Instead, Defendants argue, any incorrect food items that were served to Plaintiff was a result of inadvertent errors by kitchen staff and inmate workers, and not as the result of any deliberate indifference on the part of Defendants.  (Id. at 12.)  The Court addresses these arguments below.

### i.      Defendants Brown and Copper

Regarding Defendant Brown, the Court finds that there are genuine disputes of material fact concerning whether she was deliberately indifferent to Plaintiff's dietary needs.  As discussed above, Plaintiff has pointed to evidence that, on May 13, 2020, Barnes (a non-party who had been assisting Defendant Stuller with food services during the COVID-19 pandemic) had become aware that Plaintiff had food items on his menu, which conflicted with his dietary needs.  (Doc. No. 59-1 at 78.)  After Barnes became aware of this, he "immediately contacted [Defendant] Brown[.]"  (Id.)  Ultimately, however, the dietary staff at SCI Huntingdon was

"directed to follow the diet menus they had in place[.]"  (Id.)  Defendant Brown

has disputed these facts and claims that she never "knowingly advised staff to

serve Plaintiff food that conflicted with his dietary needs[.]"  (Id. at 124.)   Thus,

the Court finds that there is a genuine dispute as to whether Defendant Brown

knew that Plaintiff's diet menu conflicted with his dietary needs and whether, with

deliberate indifference to that fact, she directed the staff at SCI Huntingdon to

follow the menu anyway.

Additionally, the record reflects that, when Defendant Brown was rewriting

Plaintiff's menu in May of 2020, she had determined that a gluten free diet was

appropriate for Plaintiff based upon a review of his Celiac panels.  (Doc. Nos. 60 ¶

44, 63 ¶ 44.)  Although there is evidence in the record to suggest that the Celiac

panels were completed on February 5, 2020, Defendant Brown did not rewrite

Plaintiff's menu until months later in May of 2020.  (Doc. No. 63 ¶¶ 44, 45; Doc.

No. 65-1 at 201.)  Thus, the Court also finds that there is a genuine dispute as to

whether Defendant Brown knew that Plaintiff's menu was inconsistent with his

dietary needs during this timeframe, but with deliberate indifference to that fact,

she did not update his menu until May of 2020.

All that being said, it is not lost upon the Court that Defendant Brown, as the

DOC's Clinical Dietician, is not directly involved with food service at the

individual institutions and, instead, is responsible for assessing, evaluating, and

developing menus that are then forwarded to the institutions and implemented by staff. (Doc. No. 59 at 11). The Court notes, however, that Plaintiff has raised genuine disputes concerning this precise aspect of her job duties—i.e., to assess and develop Plaintiff's menu. Accordingly, the Court finds that there are genuine disputes as to whether Defendant Brown was deliberately indifferent to Plaintiff's dietary needs. In light of those disputes, the Court will deny Defendants' motion with respect to this Eighth Amendment claim against Defendant Brown.

Regarding Defendant Copper, however, the Court does not find that Plaintiff has raised any genuine disputes as to whether Defendant Copper was deliberately indifferent to Plaintiff's dietary needs. Per the parties' statements of the material facts, there are very few facts pertaining to Defendant Copper. His personal involvement in this matter concerns a May 14, 2020 letter that he had sent to Plaintiff, expressly recognizing that Plaintiff has a diagnosis for Celiac disease. (Doc. No. 63 ¶ 34.; Doc. 65-1 at 167.) While this letter certainly suggests that Defendant Copper had knowledge of Plaintiff's Celiac disease, it does not suggest that Defendant Copper knew of facts from which the inference could be drawn that a substantial risk of serious harm existed for Plaintiff or that Defendant Copper had actually drawn that inference.

Additionally, Plaintiff has not pointed to any other evidence in the summary judgment record which would demonstrate such deliberate indifference on the part

of Defendant Copper.  Plaintiff, however, may not rest upon the unsubstantiated

allegations of his statement of material facts and brief in opposition and, instead,

must go beyond those documents, "citing to particular parts of materials in the

record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials" to show the

Court that there is a genuine dispute of material fact.  See Fed. R. Civ. P. 56(c);

Celotex Corp., 477 U.S. at 324.

Because Plaintiff has failed to do so, the Court finds that summary judgment

is proper.  Thus, the Court will grant Defendants' motion with respect to Plaintiff's

Eighth Amendment claim against Defendant Copper on the basis that he acted with

deliberate indifference to Plaintiff's dietary needs.

### ii.    Defendant Stuller

Regarding Defendant Stuller, the Court also finds that Plaintiff has not

pointed to any evidence in the underlying record, which would create a genuine

dispute of material fact as to whether Defendant Stuller was deliberately indifferent

to Plaintiff's dietary needs.  Pursuant to the parties' statements of the material

facts, Defendant Stuller's personal involvement in this matter largely concerns his

responses to Plaintiff's grievances.  In those various responses, Defendant Stuller

recognized Plaintiff's complaints and explained that kitchen staff and inmate

workers had mistakenly prepared Plaintiff's meal trays with incorrect food items. (Doc. No. 60 ¶¶ 48, 51-54; Doc. No. 59-1 at 72, 84, 89, 101-02.)  While it appears that the staff and workers may have made these mistakes on numerous occasions, such inadvertent mistakes do not equate to Defendant Stuller being aware of facts from which an inference could be drawn that a substantial risk of serious harm existed for Plaintiff, or to Defendant Stuller actually drawing that inference.  To the contrary, Defendant Stuller's responses to Plaintiff's various grievances reveal that he took affirmative steps in resolving Plaintiff's complaints.  Not only did he contact Defendant Brown regarding Plaintiff's menu, but he also reminded kitchen staff and inmate workers alike to carefully follow the diet meal trays.  (Doc. No. 59-1 at 72, 84, 89, 101-02.)

Additionally, much like Defendant Copper, Plaintiff has not pointed to any other evidence in the summary judgment record which would demonstrate that Defendant Stuller was deliberately indifferent to Plaintiff's dietary needs.  As explained above, it is not enough for Plaintiff to rest upon the unsubstantiated allegations of his statement of material facts and brief in opposition.  He must go beyond those documents and cite to materials in the record. See Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324.

Because he has not done so, the Court also finds that Defendants are entitled to summary judgment with respect to Plaintiff's Eighth Amendment claim that

Defendant Stuller had been deliberately indifferent to Plaintiff's dietary needs. The Court will, therefore, grant Defendants' motion for summary judgment with respect to this claim.

### b.   Special Diet Meals During Institutional Lockdown

Defendants Copper, Brown, and Stuller also move for summary judgment on Plaintiff's Eighth Amendment claim that they acted with deliberate indifference when they failed to provide Plaintiff with special diet meals during the institutional lockdown, beginning on April 26th and ending on April 29th of 2020.  In support of their motion, Defendants have raised two arguments.  (Doc. No. 59 at 13.)

Initially, Defendants argue that the special meal service did, in fact, continue throughout the April 2020 lockdown.  (Id.)  In support, they point to Defendant Spyker's response to Grievance Number 865386, wherein Defendant Stuller had represented that the special diet trays were made during the lockdown.  (Doc. No. 60 ¶ 57; Doc. No. 59-1 at 58.)  Next, Defendants argue that, even if Plaintiff did not receive his special diet meals during the lockdown, there is no evidence in the underlying record to suggest that this was attributable in any way to Defendants Copper, Brown, or Stuller or that it was a result of their deliberate indifference to Plaintiff's dietary needs.  (Doc. No. 59 at 13.)

Although Plaintiff has filed a brief in opposition to Defendants' motion for summary judgment, Plaintiff has not squarely addressed these arguments.

37

Regardless, the Court finds that the record is bereft of any evidence that would raise a genuine dispute of material fact that Defendants Copper, Brown, or Stuller acted with deliberate indifference to Plaintiff receiving special diet meals during the lockdown.  Rather, the record demonstrates that, at most, Plaintiff did not receive his special meals during the three (3)-day lockdown due to oversight on the part of staff at SCI Huntingdon.  In fact, Defendant Spyker, who responded to Grievance Number 865386 had noticed an observation made by Plaintiff in his own grievance—that the kosher bags (i.e., special diet meals) were distributed during the lockdown.  (Id.)  In light of this observation, Defendant Spyker had concluded, and Defendants emphasize, that if Plaintiff did not receive his special diet trays, then "[i]t was an oversite [sic] and not intentional[.]"  (Id.)

Accordingly, because Plaintiff has not shown, or otherwise raised a genuine dispute of material fact, that Defendants Copper, Brown, or Stuller acted with deliberate indifference regarding Plaintiff's special meals during the lockdown, the Court finds that these Defendants are entitled to summary judgment on this claim. Thus, the Court will grant Defendants' motion for summary judgment with respect to this claim.

## IV.    CONCLUSION

Accordingly, for all of the foregoing reasons, the Court will grant in part and deny in part Defendants' motion for summary judgment.  An appropriate Order follows.

Dated: June 29, 2022                                    s/ Sylvia H. Rambo
                                                        SYLVIA H. RAMBO
                                                        United States District Judge